198 N.J. Super. 340 (1985)
486 A.2d 1311
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
NEVILLE ANDERSON, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted December 18, 1984.
Decided January 9, 1985.
*345 Before Judges MICHELS, PETRELLA and BAIME.
Joseph H. Rodriguez, Public Defender, attorney for appellant (Neil M. Cohen, designated counsel, of counsel and on the brief).
Irwin I. Kimmelman, Attorney General of New Jersey, attorney for respondent (Katherine F. Graham, Deputy Attorney General, of counsel and on the brief).
The opinion of the Court was delivered by MICHELS, P.J.A.D.
Tried to a jury defendant Neville Anderson was convicted with co-defendants Bernard Junior Reid and Samuel Booker[1] of two counts of armed robbery in violation of N.J.S.A. 2C:15-1(a)(2) and one count of possession of a handgun without having first obtained the requisite permit to carry the same in violation of N.J.S.A. 2C:39-5(b). Defendant's motion for a new trial was denied and he was committed to the custody of the Commissioner of the Department of Corrections for concurrent terms aggregating 15 years with a parole ineligibility term of 7 years *346 and assessed penalties totaling $75 payable to the Violent Crimes Compensation Board. He appeals.
Defendant seeks a reversal of his conviction and the entry of a judgment of acquittal or alternatively, the reversal of his convictions and a remand for a new trial or a modification of his sentences on the following grounds set forth in his brief.
POINT I THE STOP AND ARREST OF THE DEFENDANT AND THE SUBSEQUENT SEARCH AND SEIZURE OF CERTAIN EVIDENCE INTRODUCED AT TRIAL BELOW VIOLATED THE UNITED STATES AND NEW JERSEY CONSTITUTIONS.
POINT II THE IN-COURT IDENTIFICATION AND THE TESTIMONY RELATING TO THE PRETRIAL IDENTIFICATIONS SHOULD HAVE BEEN EXCLUDED.
POINT III THE COURT ERRED IN FAILING TO GRANT AN APPLICATION FOR A JUDGMENT OF ACQUITTAL AT THE END OF THE STATE'S CASE AND AT THE TERMINATION OF THE ENTIRE TRIAL.
POINT IV THE TRIAL COURT ERRED BY REFUSING TO PERMIT THE TESTIMONY OF THE VICTIMS TO BE READ AGAIN TO THE JURY, AFTER A PROPER JURY REQUEST.
POINT V THE TRIAL COURT FAILED TO MERGE THE APPROPRIATE LESSER INCLUDED OFFENSES AT TIME OF SENTENCING, AND THUS [SIC] WAS PLAIN ERROR.
POINT VI THE DEFENDANT WAS DENIED A RIGHT TO A FAIR TRIAL IN VIOLATION OF THE SIXTH AMENDMENT BY THE TRIAL COURT'S FAILURE TO QUESTION PROSPECTIVE JURORS ON THE ISSUE OF RACIAL BIAS, AND THE COMPOSITION OF THE JUROR ARRAY THAT DID NOT INCLUDE BLACKS.
POINT VIII THE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE AND OVERLY PUNITIVE.
We have carefully considered these contentions and all of the arguments advanced by defendant in support of them and find that they are clearly without merit. R. 2:11-3(e)(2).

I.
However, some further comment is necessary with respect to defendant's claim in Point I, infra, that the trial court committed reversible error in denying his motion to suppress evidence seized pursuant to a warrantless search. Defendant contends essentially that there was no legal basis to stop his vehicle and therefore his subsequent arrest, the search of his automobile, *347 and the seizure of the evidence introduced at trial violated his constitutional rights.
According to the State's proofs at the suppression hearing, at approximately 1:30 a.m. on May 30, 1981, Officer Mordaga of the Hackensack Police Department, while on routine patrol, received a report that three black males armed with handguns had committed an armed robbery at 263 Anderson Street in Hackensack, New Jersey. Mordaga turned onto Anderson Street and started to proceed in a westerly direction. As he reached the intersection of Anderson Street and Main Street he observed a New York registered 1974 Ford occupied by two black males traveling in the opposite direction. At that point Mordaga was several blocks away from the robbery scene. Mordaga testified that except for another police radio car, the Ford was the only other car on the road. He also testified that he could not see in the Ford's rear seat to determine whether it had a third occupant because its rear windows were tinted.
Mordaga, believing that the car's occupants fit the description of the robbery suspects, turned around and attempted to pull the Ford over. Mordaga put on his overhead lights and sounded his siren. The defendant's car slowed but did not stop. It continued at a slow speed for approximately two blocks and then halted on the Anderson Street bridge. According to Mordaga, he stopped the vehicle at approximately 1:40 a.m.  only minutes after he received the call that an armed robbery had occurred on Anderson Street. Mordaga approached the vehicle and saw the third suspect lying on the rear seat. Mordaga "felt possibly that [this suspect] had a gun" and thereupon retreated to his patrol car and called for a "backup." After the backup policemen arrived they ordered the suspects out of the car. As the defendants exited the car one of the policemen, Sergeant Elefante, observed the butt of an automatic handgun sticking out of the back seat. That handgun was seized and the suspects placed under arrest.
*348 While defendant's car was still on the Anderson Street bridge, the victims, in the company of members of the detective unit, arrived at the scene and identified defendants as their assailants. The victims also observed several items of jewelry on the front floor of the car. Additionally, Officer Rothenburger discovered another loaded .45 caliber handgun and a man's watch in the grass while searching the area near the passenger side window of the defendant's car.
The Fourth Amendment protects the "right of people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures." U.S.Const. amend IV; N.J. Const. art. 1, ¶ 7. The Fourth Amendment does not, however, proscribe all searches and seizures. Rather, it only proscribes those that are judicially deemed unreasonable. State v. Bruzzese, 94 N.J. 210, 216-217 (1983); State v. Campbell, 53 N.J. 230, 233 (1969). Indeed, as Justice Schreiber pointed out in State v. Bruzzese, "the touchstone of the Fourth Amendment is reasonableness." 94 N.J. at 217. We recognize, of course, that the burden is on the State to prove the overall reasonableness and validity of a warrantless search. See State v. Bruzzese, supra, 94 N.J. at 218; State v. Valencia, 93 N.J. 126, 133 (1963). The resolution of such Fourth Amendment issues is peculiarly dependent upon the facts involved. Commonly, such constitutional issues involve no more than a seasoned "value judgment upon a factual complex rather than an evident application of a precise rule of law." State v. Funicello, 60 N.J. 60, 72 (1972) (Chief Justice Weintraub, concurring). This is especially true with regard to investigatory detentions. Our Supreme Court has held that under a narrowly defined and controlled set of circumstances, such detentions can be constitutionally permissible, although based on less than probable cause. In State v. Hall, 93 N.J. 552 (1983), the Court pointed out in a somewhat related context that:
Our reading of Davis [v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 convinces us that for certain detentions  those that do not entail significant intrusions upon individual privacy or freedom, are productive of reliable evidence, *349 and can be effectuated without abuse, coercion or intimidation  "no probable cause in the traditional sense" is necessary in order to obtain the "authorization of a judicial officer[.]" We conclude that, under a "narrowly defined" set of circumstances, such detentions can be constitutionally permissible. Davis, 394 U.S. at 727-28, 89 S.Ct. at 1398, 22 L.Ed.2d at 681. Strictly limiting the circumstances under which such detentions take place insures that the restrictions upon individual privacy and freedom interests are minimized so that a showing of need upon less than traditional probable cause can be tolerated. See United States v. Place, supra, [462] U.S. [696] at [____], 103 S.Ct. [2637] at 2642 [77 L.Ed.2d 110] (minimally intrusive detention can be supported on less than probable cause); Terry v. Ohio, supra, 392 U.S. [1] at 27, 88 S.Ct. [1868] at 1883, 29 L.Ed.2d [889] at 909 (permitting police to conduct "stop and frisk" upon less than probable cause); Michigan v. Long, [463] U.S. [1032], 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (permitting police to conduct protective search for weapons in passenger compartment of car upon less than probable cause); cf. Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (permitting search upon probable cause determined by administrative standards). [at 561].
Other jurisdictions that have considered the question have balanced the nature and extent of the intrusion on the individual's privacy rights against the governmental interest in securing evidence of criminality. See United States v. Wylie, 569 F.2d 62, 66-67 (D.C. Cir.1977), cert. den. 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978); Wilkerson v. United States, 427 A.2d 923, 926 (D.C.App. 1981), cert. den. 454 U.S. 852, 102 S.Ct. 295, 70 L.Ed.2d 143 (1981).
In Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court concluded:
that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. [392 U.S. at 27, 88 S.Ct. 1868 at 1883, 20 L.Ed.2d 889].
In determining whether the officer acted reasonably in the circumstances "due weight must be given, not to his inchoate and unparticularized suspicion or `hunch,' but to specific reasonable inferences which he is entitled to draw from the facts in light of his experience." Id.
*350 The Supreme Court extended the logic of Terry to the analysis of car stops in Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). In Prouse the Supreme Court applied the exclusionary rule to marijuana seized in plain view on the floor of a car stopped by a policeman who testified that he had observed neither traffic nor equipment violations nor any other suspicious activity associated with the car. The officer stopped the car merely to check the driver's license and registration. In excluding the evidence the Court held that:
... except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment. [Prouse, 440 U.S. at 663, 99 S.Ct. 1391 at 1401, 59 L.Ed.2d 660].
See Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). Accord, State v. Gervasio, 94 N.J. 23 (1981); State v. Bell, 195 N.J. Super. 49 (App.Div. 1984).
The Supreme Court in Prouse noted that "[a]utomobile travel is a basic, pervasive, and often necessary mode of transportation" and that "many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel." Prouse, supra, 440 U.S. at 662, 99 S.Ct. at 1400. Nevertheless, investigatory stops of automobiles are justified by
... the reduced expectations of privacy of an occupant of an automobile, id., [United States v. Martinez-Fuerte] 428 U.S. [543] at 561, 96 S.Ct. [3074] at 3084-85, 49 L.Ed.2d [1116] at 1130, "the long history evidencing [the] utility" of brief stops for questioning, id. at 560 n. 14, 96 S.Ct. at 3084 n. 14, 49 L.Ed.2d at 1130 n. 14, and the acceptance by the public of such stops "as incident to highway use." Ibid. See also Brinegar v. United States, 338 U.S. 160, 188, 69 S.Ct. 1302, 1317, 93 L.Ed. [1879] (Jackson, J., dissenting) reh. den. 338 U.S. 839, 70 S.Ct. 31, 94 L.Ed. 513 (1949) (officials may stop car without probable cause for regulation of traffic, identification where proper and in many other circumstances that do not imply an arrest or charge of crime). This notion of a reduced expectation of privacy in the use of an automobile may be instructively contrasted with the "special protection [accorded] to the home" that was emphasized by the Supreme Court in [United States v.] Johnson [457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982)] in reaching its conclusion that the Payton [v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)] *351 decision be given retroactive effect. 457 U.S. at 552 n. 13, 102 S.Ct. at 2589 n. 13, 73 L.Ed.2d at 215 n. 13. [State v. Gervasio, 94 N.J. 23, 29 (1983).]
The principles enunciated in Terry v. Ohio and its progeny support "the narrow authority of police officers who suspect criminal activity to make limited intrusions on an individual's personal security based on less than probable cause." Michigan v. Summers, 452 U.S. 692, 698, 101 S.Ct. 2587, 2592, 69 L.Ed.2d 340 (1981). See also, United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110, 119 (1983). It is the government's interest in effective crime prevention and detection "which underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Terry, supra, 392 U.S. at 22, 88 S.Ct. 1868 at 1880, 20 L.Ed.2d 889. See United States v. Place, supra.
Based on these considerations it is manifest that in the circumstances presented here, Officer Mordaga had the "articulable and reasonable" suspicion necessary to justify an investigatory stop and detention of defendant's car. We therefore reject defendant's claim that the stop was illegal and unconstitutional.
Since we hold that the stop of defendant's car passed constitutional muster, it follows that the evidence seized was not "fruit of the poisonous tree." See Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The police properly asked defendants to alight from their car. See Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); State v. Nittolo, 194 N.J. Super. 344 (App. Div. 1984). After Sergeant Elefante saw the butt of the.45 caliber handgun in plain view, the police unquestionably had probable cause to seize the gun and to arrest all the defendants and to search them and their car's interior, including the car's glove compartment, incident to that arrest. See Texas v. *352 Brown, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); New York v. Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, reh.den. 396 U.S. 869, 90 S.Ct. 36, 24 L.Ed.2d 124 (1969); State v. Bruzzese, supra; State v. Patino, 83 N.J. 1 (1980). Even if Sergeant Elefante had not seen the gun when he did, the police could have frisked defendants for weapons pursuant to the stop and searched the automobile's passenger compartment in those areas in which a weapon might have been placed or hidden. See Michigan v. Long, supra; Pennsylvania v. Mimms, supra.
Accordingly, the trial court properly denied defendant's motion to suppress the evidence.

II.
Further, we are thoroughly satisfied that the trial court neither denied defendant a fair trial nor violated his constitutional rights by refusing to question the prospective jurors on racial and ethnic prejudice as contended in Point VI, supra. Defendant based his request for the voir dire of the jurors on the potential prejudice he claimed would arise because of his and the other defendants' strong Jamaican accents. The trial court refused the request, stating:
Now, we are a country of very many nationalities and have many people of accents. I don't think it's at all necessary. I won't ask that question because accents are a very common thing in this country and in this Court.
On voir dire the trial judge addressed the issue of prejudice generally, first asking the prospective jurors whether they had "any bias or prejudice as to this type of case or would it embarrass [them] ... to sit on it?" Two jurors who answered this question in the affirmative were dismissed, one of whom thought blacks were a persecuted race and the other of whom had been "beaten up" by four black youths while attending college. The trial judge also asked whether the jurors could *353 "decide this case ... without sympathy, bias, prejudice or passion?" No jurors responded negatively.
The United States Supreme Court has on a number of occasions addressed the issue as to when trial courts are required to voir dire prospective jurors as to their racial prejudice. See Rosales-Lopez v. United States, 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981); Ristaino v. Ross, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976); Ham v. South Carolina, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973); Aldridge v. United States, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931). The court has steadfastly refused to adopt a per se rule that due process requires a judge to accede to a request to submit specific questions on racial prejudice to prospective jurors whenever there may be a confrontation in a criminal trial between persons of different races or different ethnic origins. Rosales-Lopez, supra, 451 U.S. at 188-190, 101 S.Ct. 1629 at 1634-1635, 68 L.Ed.2d 22. Rather, the Constitution only imposes such a requirement on trial judges in "special circumstances" where racial or ethnic issues are "inextricably bound up with the conduct of the trial." Ristaino, supra, 424 U.S. at 596-597, 96 S.Ct. 1017 at 1021-1022, 47 L.Ed.2d 258. See Rosales-Lopez, supra, 451 U.S. at 189-190, 101 S.Ct. 1629 at 1634-1635, 68 L.Ed.2d 22.
Thus, in Ristaino v. Ross, supra, the Court held that a black defendant convicted in state court of violent crimes committed against a white security guard was not constitutionally entitled to a question specifically directed to racial prejudice. Similarly, in Rosales-Lopez v. United States, supra, the Court held that the trial court did not violate the constitutional rights of an individual of Mexican descent accused of conspiring to bring three illegal Mexican aliens into the United States by refusing to voir dire the prospective jurors as to any prejudice they might have had against persons of Mexican descent.
The Supreme Court utilized the opportunity in Rosales-Lopez to further refine the rule governing the voir dire of jurors as to *354 racial and ethnic prejudice in its supervisory capacity over the federal courts. The Court, laying down a nonconstitutional requirement, held that even in cases not involving "special circumstances" federal district court judges should exercise their discretion in determining whether to accede to a request to have prospective jurors questioned as to racial or ethnic prejudice. Writing for the plurality, Justice White said, in a holding apparently supported by Justice Rehnquist's concurrence:
In our judgment, it is usually best to allow the defendant to resolve this conflict by making the determination of whether or not he would prefer to have the inquiry into racial or ethnic prejudice pursued. Failure to honor his request, however, will be reversible error only where the circumstances of the case indicate that there is a reasonable possibility that racial or ethnic prejudice might have influenced the jury. [451 U.S. at 191, 101 S.Ct. 1629 at 1635, 68 L.Ed.2d 22].
Justice White also, in a holding explicitly not followed by the concurrence, attempted to create a per se rule "that federal trial courts must make such an inquiry when requested by a defendant accused of a violent crime and where the defendant and the victim are members of different racial or ethnic groups." Rosales-Lopez, supra, 451 U.S. at 192, 101 S.Ct. 1629 at 1636, 69 L.Ed.2d 22.
We substantially followed the Supreme Court's position in State v. Long, 137 N.J. Super. 124 (App.Div. 1975), certif. den. 70 N.J. 143 (1976), wherein we held that:
[t]he fact that a defendant is black does not in itself demand that a judge must accede to a request to submit specific questions on racial prejudice to prospective jurors. As a corollary, the failure to make such inquiry in the normal case, absent other factors, does not constitute a violation of due process so as to mandate a reversal because of such failure.
We now turn to the alternative argument that the failure to question the jurors constituted an abuse of discretion. Where a defendant does request a voir dire inquiry as to potential prejudice because of color or other physical characteristics, it is better practice for a judge to accede to the request and pose simple and direct questions pointed to the specific element of prejudice involved. However, a judge's refusal to interrogate jurors on a particular form of prejudice does not necessarily constitute an abuse of discretion reaching the level of reversible error. State v. Kelly, 118 N.J. Super. 38 (App.Div.), certif. den. 60 N.J. 350 (1972). It depends on the factual underpinning of the case *355 itself, the characteristics of the principals involved in the crime, and a realistic assessment of the prejudice potential which may be introduced thereby. See Aldridge v. United States, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931); United States v. Robinson, 466 F.2d 780, 782 (7 Cir. 1972) (federal court practice). [137 N.J. Super. at 131-132].
We further held that in the absence of "special circumstances" the trial judge neither violated the constitutional rights of the defendant nor abused his discretion. As the Court described:
Defendant was charged with making a sale of a controlled dangerous substance to a police officer who was acting as an undercover agent. Defendant was black and the police officer was white. Otherwise, there were no racial overtones in the background of defendant, the nature of the crime, the milieu of the community, or in any pretrial publicity which would warrant the judge or the parties to anticipate realistically any possible racial prejudice on the part of prospective jurors. [137 N.J. Super. at 132].
But see State v. Sims, 140 N.J. Super. 164 (App.Div. 1976), (wherein we held that where three black men were charged with the attempted murder of two white police officers, the trial judge should have acceded to defendant's request that the prospective jurors be questioned as to their racial prejudice.)
Based on the foregoing authority, we conclude that the first inquiry should be whether racial overtones or prejudices were so "inextricably bound up with the conduct" of defendant's trial that the court denied defendant due process by refusing to accede to his request. Absent such "special circumstances," the court must then determine whether, adopting the Supreme Court's language, the trial judge's refusal constituted an abuse of discretion because the factual underpinnings of the case created a "reasonable possibility" that racial or ethnic prejudice might have influenced the jury.
The only grounds offered by defendant at trial for questioning the prospective jurors as to their racial and ethnic bias was the defendant's Jamaican accent. However, it is well-established that simply because a defendant is of a particular race or ethnicity does not warrant a finding that the trial judge committed reversible error by refusing the defendant's request. See Rosales-Lopez, supra, 451 U.S. at 188-190, 101 *356 S.Ct. 1629 at 1634-1635, 68 L.Ed.2d 22; Ristaino, supra, 424 U.S. at 594-595, 96 S.Ct. 1017 at 1020-1021, 47 L.Ed.2d 258; Long, supra, 137 N.J. Super. at 131. As the Supreme Court said in Ristaino:
In our heterogeneous society policy as well as constitutional considerations militate against the divisive assumption  as a per se rule  that justice in a court of law may turn upon the pigmentation of skin, the accident of birth, or the choice of religion. See Connors v. United States, 158 U.S. 408, 415, 39 L.Ed. 1033, 15 S.Ct. 951 (1895). [424 U.S. at 596 n. 8, 96 S.Ct. 1017 at 1021 n. 8, 47 L.Ed.2d 258].
We therefore conclude that defendant's accent by itself neither constituted a "special circumstance" giving rise to a violation of due process nor created a "reasonable possibility" of prejudicial influence on the jury giving rise to an abuse of discretion.
Moreover, the fact that defendant committed a violent crime and while committing the violent crime may have used excessive profanity and made racial slurs are not sufficient in the circumstances of this case to justify a finding of "special circumstances," requiring the trial court to voir dire the jury. First, the claim that excessive profanity and racial slurs were made during the commission of the crime was not reasonably to be anticipated and was not before the trial court when it made its ruling. Secondly, the fact that defendant committed a violent crime against white victims in and of itself does not mean racial prejudice was "inextricably bound up with the conduct of the trial." Rosales-Lopez, supra, 451 U.S. at 189, 101 S.Ct. 1629 at 1634, 68 L.Ed.2d 22.
Moreover, although the most desirable result would have been for the trial court to accede to defendant's request to question the jury, in the circumstances of this case we hold that its refusal to do so did not constitute a mistaken exercise of discretion. See Long, supra, 137 N.J. Super. at 131-132. Beyond this, in view of the overwhelming evidence of guilt, the alleged error did not reach dimensions "sufficient to raise a reasonable doubt as to whether the error led the jury to a result *357 it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971). See Rosales-Lopez, 451 U.S. at 194-195, 101 S.Ct. 1629 at 1637-1638, 68 L.Ed.2d 22. (Rehnquist, J., concurring).
Finally, defendant challenges the jury selection as prejudicial because the jury panel included no persons of his race. Defendant correctly notes that petit juries must be representative of the community. Thiel v. Southern P. Co., 328 U.S. 217, 220-221, 66 S.Ct. 984, 985-986, 90 L.Ed. 1181 (1946); Smith v. Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940); State v. Rochester, 54 N.J. 85, 88 (1969). Nonetheless, "[t]hough arbitrary exclusions of identifiable groups, whether designedly or neglectfully, may not be tolerated, there is no constitutional barrier to a mode of selection which, though it involves the exercise of discretion, is ... reasonably designed to obtain competent jurors from a cross-section of the community." Rochester, supra, 54 N.J. at 89. As the trial court stated, "[a]s long as selection has been fair or impartial there is no cause for complaint." Defendant offers no grounds for finding that the jury selection process in Bergen County arbitrarily excluded any particular race or ethnicity.

III.
We also are satisfied that defendant's claim that his conviction for unlawful possession of a handgun should merge with his convictions for robbery, raised for the first time on appeal (Point II, supra), is equally without merit.
The concept of merger "implicates the prohibition against double punishment for a single offense." State v. Truglia, 97 N.J. 513, 522 (1984). See State v. Best, 70 N.J. 56, 60 (1976); State v. Davis, 68 N.J. 69, 77 (1975); State v. Jamison, 64 N.J. 363, 380 (1974). Our courts have, in the past, applied a mechanical test for merger, as stated by Judge (later Justice) Francis in State v. Hill, 44 N.J. Super. 110 (App.Div. 1957):

*358 The test to be applied in deciding the issue of merger is whether a particular act involved in a single transaction is a distinct criminal affair or an integral part of the principal offense charged. A prosecution for any part of a single crime bars any additional prosecution or sentence for the whole crime or any other constituent element of the whole crime. State v. Labato, 7 N.J. 137, 145, 146, 150 (1951); State v. Mowser, 92 N.J.L. 474, 483 (E. & A. 1919); State v. Cooper, 13 N.J.L. 361, 375 (Sup.Ct. 1833); 15 Am.Jur., Criminal Law, § 386, p. 388 (1938). [at 112. See State v. Jamison, 64 N.J. 363, 380 (1974)].
Recently, the New Jersey Supreme Court has begun to eschew these mechanical tests and has adopted a more flexible approach, pursuant to State v. Davis, 68 N.J. 69 (1975), which focuses on the "episodic fragments," Truglia, supra, 97 N.J. at 521, of events:
The next step, then, is to determine whether, despite the clear signal in the multi-count indictment that the defendants in the cases before us must answer what are denominated as two or more separate charges, nevertheless they can of necessity be convicted of but one crime by application of one of the "offense defining" tests for "sameness."
* * * * * * * *
As a practical matter ... it may be helpful to employ a certain flexibility of approach to the inquiry of whether separate offenses have been established under the proofs, attended by considerations of "fairness and fulfillment of reasonable expectations in the light of constitutional and common law goals." State v. Currie, 41 N.J. 531, 539 (1964). Such an approach would entail analysis of the evidence in terms of, among other things, the time and place of each purported violation; whether the proof submitted as to one count of the indictment would be a necessary ingredient to a conviction under another count; whether one act was an integral part of a larger scheme or episode; the intent of the accused; and the consequences of the criminal standards transgressed.
Certainly there are other factors to be considered and, along with the above, accorded greater or lesser weight depending on the circumstances of the particular case. We mean to emphasize that by referring to these elements we do not intend either to create exclusive categories of evidence which may be of critical significance or to shroud the analytical process in any mystery. In reality we are simply reflecting, in the context of these cases, on the traditional determination of sufficiency of proofs. [Davis, supra, 68 N.J. at 81-82].
Whether we apply the mechanical test of Hill or the more modern flexible approach of Davis, it is well-established that the illegal possession of a firearm should not merge with first degree armed robbery. See State v. Best, supra, 70 N.J. at 66-67; State v. Trent, 157 N.J. Super. 231, 234 (App.Div. 1978), rev'd on other grounds 79 N.J. 251 (1979); State v. *359 Pratts, 145 N.J. Super. 79, 94 (App.Div. 1975), aff'd 71 N.J. 399 (1976). Unlawful possession requires the State to prove not only that a defendant possessed a gun but also that he lacked a permit for it. Thus, applying a mechanical test, the possessory offense requires proof of an additional element from the possessory element of first degree armed robbery. Moreover, examining the evidence in the case as a whole, it is undisputed that defendants brought the guns to the scene of the robbery and had possession of them when detained and arrested. In the circumstances it is perfectly clear that defendant's possession of the gun was a separate and distinct criminal transaction. See Pratt, supra, 145 N.J. Super. at 94.
Accordingly, defendant's convictions and sentences imposed thereon are affirmed.
NOTES
[1] We are today filing separate opinions affirming the convictions of defendants Bernard Junior Reid (State v. Reid, A-3256-81T4) and Samuel Booker (State v. Booker, A-3567-81T4).